IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| GENE R. ROMERO<br>600 East Eighth Street<br>Kansas City, Missouri 64106,<br><br>JAMES T. BEVER<br>1206 North Main Street<br>Hutchinson, Kansas 67501,<br><br>ROGER T. BOYD<br>581 Alford Road<br>Ellensburg, Washington 98926,<br><br>RICHARD A. CARRIER<br>35325 Farm Market 1736<br>Hempstead, Texas 77445,<br><br>PAUL R. COBB<br>10895 S.W. 38th Drive<br>Davie, Florida 33328,<br><br>CRAIG K. CREASE<br>12013 West 74th Street<br>Shawnee, Kansas 66216,<br><br>SYLVIA CREWS-KELLY<br>2623 Robertson Trail<br>Lutz, Florida 33549,<br><br>DWIGHT ENGLISH<br>1520 Smith Drive<br>Lebanon, Tennessee 37087,<br><br>RONALD W. HARPER<br>1354 Wrightsboro Road, N.W.<br>Thomson, Georgia 30824, | Civil Action No. _____<br><br><br>COMPLAINT |

LARRY H. LANKFORD, Sr.                    )
925 Mallock Road                          )
White Lake, Michigan 48386                )
                                          )
DAVID C. LAWSON                           )
Route 2                                   )
St. Matthews, South Carolina 29135        )
                                          )
NATHAN R. LITTLEJOHN II                   )
13294 West 112th Terrace                  )
Overland Park, Kansas 66210,              )
                                          )
REBECCA R. MASLOWSKI                      )
4260 Admire Road                          )
Dover, Pennsylvania 17315,                )
                                          )
CRAIG A. MILLISON                         )
3412 East Market Street                   )
York, Pennsylvania 17402,                 )
                                          )
JAMES E. MOOREHEAD                        )
1875 Cussingham Circle                    )
Ocoee, Florida 34761,                     )
                                          )
CHRISTOPHER L. PERKINS                    )
156 Mount Carmel Road                     )
Newnan, Georgia 30263,                    )
                                          )
RICHARD E. PETERSON                       )
581 Graystone Place                       )
Evans, Georgia 30809,                     )
                                          )
JAMES P. PILCHAK                          )
10315 Michael Street                      )
Taylor, Michigan 48180,                   )
                                          )
PAULA REINERIO                            )
1102 Zblewski Drive                       )
Plover, Wisconsin 54467,                  )

DONALD L. TRGOVICH
10760 E. Placita Los Reyes
Tucson, Arizona 85748,

RICHARD S. WANDNER
10434 N.W. Sixth Court
Coral Springs, Florida 33071,

TIMOTHY WEISMAN
3703 75th Drive East
Sarasota, Florida 34243,

ANTHONY T. WIKTOR
56 Cobbs Lake
Lake Ariel, Pennsylvania 18436,

JOHN W. WITTMAN
1491 Radcliff Lane
Aurora, Illinois 60504, and

RALPH J. WOLVERTON
104 Cedar Dale Drive
Papillon, Nebraska 68046,

        *Plaintiffs,*

   v.

ALLSTATE INSURANCE COMPANY,
3075 Sanders Road
Northbrook, Illinois 60062,

        *Defendant.*

## I.
## INTRODUCTION

1.    Plaintiffs bring this action because defendant Allstate Insurance Company

*Co., et al.,* No. 01-CV-3894 ("*Romero I*"), as well as to otherwise deter plaintiffs from pursuing claims of discrimination and retaliation under the Age Discrimination in Employment Act of 1967, as amended ("ADEA"), 29 U.S.C. §§ 621, *et seq.*, and the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001, *et seq.* With its malicious tort claims and frivolous demands for constructive trusts and all manner of alleged damages, including punitive damages, Allstate acted with reckless disregard of whether its actions were retaliatory, in bad faith and otherwise in violation of federal law. It did so with the intent to injure and unlawfully retaliate against plaintiffs and otherwise threaten and intimidate them from availing themselves of the statutory protections afforded under federal laws like the ADEA and ERISA.

2.      Plaintiffs are current and former employees of Allstate whose employment contracts were terminated summarily by the company as of June 30, 2000, as part of the "Preparing for the Future" Group Reorganization Program (the "Mass Termination Program"). In November 1999, Allstate, together with its parent company, The Allstate Corporation, and their president, chairman and chief executive officer, Edward M. Liddy, presented plaintiffs and approximately 6,200 other long-time employees with a Hobson's choice: (a) sign a facially invalid "General Release and Waiver Agreement" (the "Release") and thereby be permitted to remain in the service of Allstate and attempt to recoup the substantial time and money invested over years of exclusive service dedicated to Allstate, or (b) refuse to sign the Release, forfeit such investments and be barred from

and retaliation with the Equal Employment Opportunity Commission ("EEOC").  After the EEOC found that the Release was obtained unlawfully, and was not successful in its initial attempts to conciliate the unlawful and retaliatory conduct, plaintiffs filed a class action lawsuit in this Court on August 1, 2001.  Among other things, plaintiffs alleged in their First Amended Complaint that the Release was invalid and unenforceable and that the Mass Termination Program was designed and implemented in violation of the ADEA and ERISA.  Plaintiffs also alleged that defendants breached certain contractual rights and fiduciary duties.[1]  The EEOC later filed its own lawsuit alleging that Allstate's refusal to allow plaintiffs and other employee agents to remain as agents without signing the Release constitutes unlawful retaliation in violation of the ADEA, Title VII of the Civil Rights Act of 1964 ("Title VII") and the Americans with Disabilities Act of 1990 ("ADA") and unlawful interference, coercion and intimidation in the exercise and enjoyment of rights under the ADA.

4.    After the Court, by Order dated February 28, 2002, denied sundry motions to dismiss the *Romero I* and EEOC actions, Allstate and its co-defendants filed their answer to the First Amended Complaint on March 11, 2002.  Rather than simply defending against plaintiffs' allegations, defendants struck back by embarking upon an unlawful and retaliatory scheme to punish plaintiffs and otherwise intimidate and deter

more than 6,200 other similarly situated current and former employee agents from vindicating their federally-protected right to challenge the Release.

5.    At the heart of this retaliatory strategy was Allstate's decision to forego "garden variety" affirmative defenses such setoff and recoupment and instead bring three purported common law counterclaims sounding in tort.  Even though it also countersued the 28 named plaintiffs who signed the Release for so-called "unjust enrichment"– a claim that cannot be reconciled with its allegation that plaintiffs violated the "express terms" of the Release – Allstate, with the complicity of its attorneys, and in a calculated effort to maximize the potential chilling effect of its actions, asserted purported state law counterclaims for fraud, negligent misrepresentation, and breach of the duty of good faith and fair dealing.  Allstate, presumably acting under the advice of its attorneys, did not to assert a counterclaim for breach of contract even though the allegations of the counterclaims and prayer for relief make repeated reference to such a claim.

6.    As alleged by Allstate, the counterclaims arise out its reliance on some sort of "representation" – that is, a "promise" inherent in the mere act of signing the Release – by plaintiffs that they would not to file a "legal claim" or "legal action" or "otherwise assert the claims" set forth in the First Amended Complaint.  Allstate seeks to have this Court enforce the alleged promise not to file a lawsuit or take "other actions" such a filing charges of discrimination and retaliation and assisting the EEOC and Pension and Welfare Benefits Administration by, among other things, imposing

including the statutory right to challenge whether the Release was knowing and voluntary and otherwise complied with the enumerated threshold requirements of 29 U.S.C. § 626(f)(1)(A)-(H).  Even prior to June 1, 2000, the deadline for signing the Release, more than a year before plaintiffs sued Allstate and its co-defendants, Allstate's attorneys represented to the EEOC in writing that employee agents such as plaintiffs who signed the Release had a federally-protected right to challenge the Release even after they signed it.  Even though it has refused to withdraw the counterclaims with prejudice, Allstate since has reaffirmed that employee agents who signed the Release were not barred from filing charges with the EEOC or otherwise challenging its voluntariness.

.        8.        Even though Allstate acknowledges that it "normally doesn't file counterclaims in employment litigation," it nevertheless filed frivolous counterclaims motivated by retaliatory animus, all in reckless disregard for the matter of whether its retaliatory conduct was prohibited under the ADEA and ERISA.  In so doing, Allstate sought to punish plaintiffs for having filed a lawsuit and having taken "other actions" such as filing charges with the EEOC and Pension and Welfare Benefits Administration by unjustly and maliciously accusing them of fraud and otherwise threatening them with the specter of a constructive trust over their personal assets, as well as an economically-devastating award of unspecified consequential, incidental and punitive damages, thereby adversely affecting their lives, personal and business reputations and future employment opportunities.

full well that the mere assertion of unlawful and retaliatory counterclaims such as the one for fraud would have the ultimate effect of deterring other employee agents from engaging in protected activity by challenging the Release and otherwise asserting claims for discrimination and retaliation. Allstate thus sent a chilling warning that the potential for economic reprisal awaited anyone who was thinking about challenging the Release and standing up to the company in a court of competent jurisdiction.

## II.
## JURISDICTION AND VENUE

10.    This is a civil action for legal and equitable relief over which original jurisdiction is vested in this Court by 28 U.S.C. §§ 1331 and 1343(a), 28 U.S.C. § 2201(a) and 29 U.S.C. § 626(f)(3). This Court also is vested with exclusive subject-matter jurisdiction over plaintiffs' claims under section 502(e)(1) and (f) of ERISA, 29 U.S.C. § 1132(e)(1) & (f).

11.    Venue is appropriate in this Court under 28 U.S.C. § 1391 and 29 U.S.C. § 1132(e)(2) as it is brought in a judicial district in which Allstate resides or may be found at the time the action is commenced and in which the retaliatory and unlawful acts that are the subject of this Complaint took place. In addition, several of the plaintiffs and others affected by the retaliatory actions alleged in this Complaint reside counties comprising this judicial district.

**III.**
**THE PARTIES**

A.    **PLAINTIFFS**

_**General allegations as to all plaintiffs**_

12.    Each of the plaintiffs is a named plaintiff in _Romero I_ and _Romero II._ As such, they have asserted claims against Allstate arising under various federal statutes prohibiting discrimination and retaliation, including the ADEA and ERISA.  Each of the plaintiffs is also a defendant in _Romero I_ as to each of the four purported counterclaims asserted by Allstate.

13.    At the time of the events giving rise to the claims asserted herein and in _Romero I_, each of the plaintiffs in this action was an "employee" within the meaning of 29 U.S.C. §§ 630 and 1002(6), and a "participant" in and/or "beneficiary" of one or more employee benefit plans covered by ERISA, 29 U.S.C. § 1002(7) & (8).  Each of the plaintiffs was at least 40 years of age as of August 1, 2001, the date they engaged in protected activity by filing a lawsuit challenging the lawfulness and enforceability of the Release.

14.    All administrative prerequisites for maintaining an action for retaliation have been met.  Each of the plaintiffs has placed Allstate on notice of allegations of retaliation in violation of the ADEA by filing a timely charge with the EEOC.  After thoroughly investigating such charges, the EEOC determined that the purported counterclaims constituted unlawful retaliation in violation of the ADEA.  The EEOC

against it." According to the EEOC, Allstate "failed to produce any convincing evidence" to support its counterclaims and filing the counterclaims "is in contradiction to [the] position [Allstate] stated to the Commission and is compelling evidence that Allstate did not file its counterclaims in good faith."

### *Specific allegations as to individual plaintiffs*

15.     Plaintiff Gene R. Romero is a resident of the State of Missouri.

16.     Plaintiff James T. Bever is a resident of the State of Kansas.

17.     Plaintiff Roger T. Boyd is a resident of the State of Washington.

18.     Plaintiff Richard A. Carrier is a resident of the State of Texas.

19.     Plaintiff Paul R. Cobb is a resident of the State of Florida.

20.     Plaintiff Craig K. Crease is a resident of the State of Kansas.

21.     Plaintiff Sylvia A. Crews-Kelly is a resident of the State of Florida.

22.     Plaintiff Dwight F. English is a resident of the State of Tennessee.

23.     Plaintiff Ronald W. Harper is a resident of the State of Georgia.

24.     Plaintiff Michael P. Kearney is a resident of the State of Kansas.

25.     Plaintiff Thomas A. Kearney is a resident of the State of Illinois.

26.     Plaintiff Larry H. Lankford, Sr. is a resident of the State of Michigan.

27.     Plaintiff David C. Lawson is a resident of the State of South Carolina.

28.     Plaintiff Nathan R. Littlejohn, II is a resident of the State of Kansas.

29.     Plaintiff Rebecca R. Maslowski is a resident of the Commonwealth of

31.    Plaintiff James E. Moorehead is a resident of the State of Florida.

32.    Plaintiff Christopher L. Perkins is a resident of the State of Georgia.

33.    Plaintiff Richard E. Peterson is a resident of the State of Georgia.

34.    Plaintiff James P. Pilchak is a resident of the State of Michigan.

35.    Plaintiff Paula Reinerio is a resident of the State of Wisconsin.

36.    Plaintiff Paul L. Shirley is a resident of the State of Florida.

37.    Plaintiff Donald L. Trgovich is a resident of the State of Arizona.

38.    Plaintiff Richard S. Wandner is a resident of the State of Florida.

39.    Plaintiff Timothy Weisman is a resident of the State of Florida.

40.    Plaintiff Anthony T. Wiktor is a resident of the Commonwealth of
Pennsylvania.

41.    Plaintiff John W. Wittman is a resident of the State of Illinois.

42.    Plaintiff Ralph J. Wolverton is a resident of the State of Nebraska.

**B.    DEFENDANT**

43.    Defendant Allstate Insurance Company is an Illinois corporation, having
its principal place of business in Northbrook, Illinois.  Allstate conducts business
throughout the United States and abroad, including in the Commonwealth of
Pennsylvania, whether through its parent, an affiliate or subsidiary or otherwise.  Allstate
is an "employer" within the meaning of 29 U.S.C. §§ 630(b) and 1002(5) at all relevant
times in that it is a person engaged in an industry affecting commerce who had twenty of

## IV.
## FACTUAL ALLEGATIONS

44. In November 1999, Liddy announced the Mass Termination Program under which the employment contracts of over 6,200 agents were to be terminated by December 31, 2000. Integral to the Program was the insidious and unconscionable requirement that employee agents sign the Release in order to be permitted to continue in the "captive" service of their employer – but without any of the benefits and protections to which they had been entitled as employees – or otherwise attempt to recoup the time and money invested over many years of faithful service as Allstate employees.

45. Upwards of 300 employee agents, including each of the plaintiffs, subsequently filed timely charges of discrimination and retaliation with the EEOC.

46. By letter dated May 2, 2000, the EEOC advised Allstate of the preliminary determination that the Release was unlawful. Allstate responded to the preliminary determination through its attorneys, who represented in writing that "there is no limitation on an agent's right to file an EEOC charge, participate in an EEOC investigation or cooperate with the EEOC in any way." Two weeks later, in a letter dated May 30, 2000, Allstate's attorneys again represented that "every agent who signs the Release *has an opportunity to challenge its voluntariness . . .* " Allstate also admitted subsequent to filing the counterclaims that agents who signed the Release were not barred from filing charges with the EEOC or otherwise challenging the validity of the Release.

47. Faced with the prospect of the threatened termination of their ability to

the plaintiffs, and all but 19 or so of the 6,200 employee agents subject to the Mass Termination Program, had no viable option other than to sign the Release.

48.     On its face, the Release purported to bar plaintiffs from filing "charges . . . including any claims for age or other types of discrimination prohibited by the [ADEA]." Nonetheless, Allstate never informed any of the plaintiffs, including those who had filed charges of discrimination and retaliation before signing the Release, that agents who signed the Release would not be barred from challenging its validity, whether as expressly authorized by the Older Workers Benefit Protection Act ("OWBPA") or otherwise.  The Release also contained no provision purporting to require "tender back" of any benefit employee agents allegedly received or the payment of attorneys' fees.  The Release did not include a severability provision.

49.     At the time they signed the Release, at least some of the plaintiffs already had filed charges of discrimination and retaliation with the EEOC.  More importantly, as each of the plaintiffs has now testified under oath, none of them had formed an intent at the time each signed the Release to file a lawsuit against Allstate, although some of them admittedly hoped that the EEOC or another governmental agency would seek to invalidate the Release as unlawful.  Even when faced with such testimony, as well as the EEOC's determination that there is no evidence that any of the plaintiffs  had decided to bring a lawsuit against Allstate at the time they signed the Release, Allstate has refused to dismiss its counterclaims with prejudice.  In fact, according to the EEOC, the

50.    Plaintiffs filed the *Romero I* action on August 1, 2001, and in Count I of their First Amended Complaint, sought a judicial declaration that the Release is void and unenforceable.  In the other counts, plaintiffs asserted that design and implementation of the Mass Termination Program violated the ADEA and ERISA, and constituted a breach of certain contractual rights and fiduciary duties.  All of those claims arise out of the same transactions and occurrences as the claim that the Release is invalid and unenforceable.

51.    On March 11, 2002, Allstate and its co-defendants filed their answer to the First Amended Complaint.  In the responsive pleading, Allstate attempts to state four purported counterclaims:  unjust enrichment, fraud, negligent misrepresentation, and breach of the duty of good faith and fair dealing.  Each purported counterclaim rests on the unfounded allegation that even though plaintiffs purportedly had made up their minds that they were going to sue Allstate and otherwise challenge the Release, they "represented" or otherwise promised they would not do so upon signing the Release.

52.    Allstate had no evidentiary support whatsoever for these unfounded allegations as required by Federal Rule of Civil Procedure 11(b)(3).  To the contrary, Allstate and its attorneys knew that plaintiffs had a federally-protected right to challenge the scope and validity of the Release in good faith, including the statutory right to challenge whether it was knowing and voluntary and otherwise complied with the enumerated threshold requirements of the OWBPA.  Because Allstate and its attorneys

53.    Allstate and its attorneys also knew that plaintiffs were required to assert all claims arising out of the same transaction or occurrence, or series of transactions or occurrences, or face the risk that such claims could be barred.  Allstate and its attorneys therefore necessarily knew that plaintiffs had not "represented" or otherwise promised not to assert claims arising out of the Mass Termination Program contingent on a judicial determination that the Release was invalid or otherwise unenforceable.

54.    Moreover, as of March 11, 2002, Allstate and its attorneys knew and acted with reckless disregard of the fact that the state law counterclaims were meritless for myriad other reasons, such as the fact that they were preempted by the ADEA and ERISA and barred by the "gist of the action" and economic loss doctrines.  Based on representations to the EEOC its attorneys made in May 2000, Allstate also knew that it could not satisfy critical elements of the counterclaims in addition to the element of a promise or false representation.  For example, Allstate knew and acted with reckless disregard of the fact that that it could not possibly prove detrimental reliance under circumstances where it decided to proceed with the Mass Termination Program in the face of the EEOC's determination that the Release was invalid and request to suspend the Release requirement.

55.    Allstate nevertheless asserted the purported counterclaims to retaliate against and punish plaintiffs for having engaged in protected activity.  Allstate also asserted the counterclaims for the equally improper purpose of deterring members of the

56. Allstate knowingly and intentionally chose to assert counterclaims with the most severe retaliatory impact – that is, counterclaims that were designed to inflict the greatest possible professional and reputational damage and raise the greatest possible economic threat to plaintiffs. Not surprisingly, Allstate has succeeded in adversely affecting plaintiffs, including shedding a negative light on their professionalism and ethics, marring their professional reputations and otherwise damaging them, all of which could have an adverse affect on prospective employment opportunities. Subsequent to the date the purported counterclaims were brought by Allstate, at least one of the plaintiffs was turned down for a business loan essential to his ability to continue to operate his insurance agency in compliance with Allstate's sales quotas known as "expected results." This plaintiff was informed by a prospective lender that the loan would have been advanced if the counterclaims had not been pending. Other of the plaintiffs have been forced to disclose to third parties such as mortgage lenders that they were currently being sued for fraud and punitive damages. Yet others were deterred from seeking loans or otherwise engaging in transactions that would require them to disclose the purported counterclaims.

57. The bad faith assertion of frivolous counterclaims has caused other injury, including, but not limited to mental distress and anguish, to each of the plaintiffs and their immediate families. Indeed, even though they know the counterclaims were frivolous and brought in retaliation for filing a lawsuit and engaging in "other actions"

58.     Allstate refused to voluntarily withdraw the purported counterclaims with prejudice, even in the face of overwhelming evidence that they were not well-grounded in fact or law.  Although Allstate later would ask for leave to amend the counterclaims, it did so only when threatened with the imposition of sanctions under Federal Rule of Civil Procedure 11.  Despite the fact that its claims are preempted, redundant and otherwise fail to state a claim upon which relief can be granted, Allstate asked for leave only to eliminate the three most egregious counterclaims, refusing to dismiss those counterclaims with prejudice, while at the same time wanting to assert new affirmative defenses and offensive counterclaims that it chose not to bring in the first place, thereby leaving the threat of reassertion of counterclaims hanging over the heads of the plaintiffs indefinitely.

## V.
## CLAIMS

### COUNT I

**Retaliation In Violation Of The ADEA**
**(29 U.S.C. § 623(d))**

59.     Plaintiffs restate and reallege the allegations contained in paragraphs 1 to 58 of this Complaint as though set forth here in full.

60.     The purported counterclaims are premised on the bare, unsupported allegations that each of the plaintiffs (1) falsely "represented" or otherwise promised that they would not challenge the Release or otherwise take "other actions" to assert claims arising out of the Mass Termination Program and (2) falsely represented that they had no

61.    These allegations are false, motivated by unlawful retaliatory animus and otherwise brought in bad faith and for an improper purpose to vex and harass plaintiffs. Further, in bringing the counterclaims, Allstate embarked on a course of retaliatory conduct which it know was in violation of the ADEA and ERISA and acted with reckless disregard of the fact that its actions were unlawful and retaliatory.

62.    Throughout the period from May 2000 through the filing of counterclaims and until today, Allstate has known and repeatedly acknowledged, that plaintiffs and other employee agents subject to the Mass Termination Program did not represent when they signed the Release that they would not challenge the validity of the Release, including its voluntariness. Throughout the same period, Allstate and its attorneys have known that, if plaintiffs or others challenged the validity of the Release, they also had to assert in the same lawsuit any other claims arising out of the design and implementation of the Mass Termination Program, including claims for age discrimination, retaliation, unlawful interference with the attainment of employee benefits, breach of contract and breach of fiduciary duty, or risk those claims being barred. Thus, at the time the purported counterclaims were brought, Allstate and its attorneys knew that any counterclaims remised on the notion that agents had promised or represented that they would not sue Allstate or take "other actions," was meritless.

63.    Allstate knew that its counterclaims were meritless in other ways as well.

64.    Plaintiffs engaged in protected activity by (a) filing charges of

assistance to the United States Department of Labor and Pension Welfare Benefits Administration in connection with their own investigation of the Mass Termination Program, and (d) challenging the Release by bringing a lawsuit under the ADEA and ERISA. At the time it filed its purported counterclaims, Allstate was aware of plaintiffs' protected activities.

65.     Allstate filed the counterclaims knowing full well that they were devoid of legal and factual merit and contrary to representations that its attorneys made to the EEOC in writing on at least two occasions prior to June 1, 2000. Moreover, Allstate filed the purported counterclaims with the retaliatory motive of punishing plaintiffs for filing charges of discrimination and retaliation with the EEOC and thereafter bringing a class action lawsuit on behalf of 6,200 similarly situated current and former employee agents challenging the validity of the Release. Allstate additionally sought to chill its current and former employees, including, but not limited to, hundreds of so-called "life specialists" whose employment contracts were terminated as of June 30, 2001, from availing themselves of their federally protected right to challenge ADEA waivers or otherwise pursue allegations of discrimination and retaliation out of fear that they could subject themselves to liability for compensatory and punitive damages.

66.     The conduct of Allstate as set forth in this Count was willful, intentional and deliberate. The filing of the counterclaims was a naked form of coercion and economic retaliation that was taken against plaintiffs solely because they had invoked

unlawful employment practice in violation of section 4(d) of the ADEA, 29 U.S.C. § 623(d). Allstate had no good-faith, non-retaliatory basis to bring counterclaims that are not well-grounded in fact or law.

67. As a result of the unlawful and retaliatory actions alleged in this Count, plaintiffs have been damaged and otherwise adversely affected. Plaintiffs have suffered financial and non-financial injuries, including, but not limited to, damage to their personal and professional reputations affecting their business and employment opportunities.

## COUNT II

### Interference With Protected Rights And Retaliation
### In Violation Of Section 510 Of ERISA
### (29 U.S.C. § 1140)

68. Plaintiffs restate and reallege the allegations contained in paragraphs 1 to 67 of this Complaint as though set forth here in full.

69. The purported counterclaims are premised on the bare, unsupported allegations that each of the plaintiffs (1) falsely "represented" and otherwise promised that they would not challenge the Release or otherwise take any other action to assert claims arising out of the Mass Termination Program, (2) falsely represented that they had no intention to sue Allstate or otherwise assert claims arising out of the Mass Termination Program at the time they signed the Release, (3) "failed to act with honesty in fact" by executing the Release "with the belief and intention to file or having filed legal actions

other actions against Allstate." These allegations are false, motivated by unlawful retaliatory animus and otherwise brought in bad faith and for an improper purpose.

70.    Throughout the period from May 2000 through the filing of counterclaims and until today, Allstate has known and has represented that the plaintiffs and other agents did not represent when they signed the Release that they would not challenge the validity of the Release. Throughout the same period, Allstate has known that, if plaintiffs or other employee agents brought an action challenging the Release as not knowing or voluntary, they also had to assert in the same lawsuit both other grounds for invalidating the Release and all other claims arising out of the Mass Termination Program or run the risk that those claims could be barred down the road. Thus, Allstate knew, when it filed the counterclaims, that any allegation premised on the unfounded notion that plaintiffs had "represented" or otherwise promised that they would not challenge the Release, including its voluntariness, lacked legal and factual merit.

71.    Allstate knew that its counterclaims were meritless in other ways as well.

72.    Plaintiffs engaged in protected activity by (a) filing charges of discrimination and retaliation with the EEOC and other civil rights agencies, (b) providing assistance to the EEOC in connection with its investigation of whether the Mass Termination Program violated the ADEA, Title VII and the ADA, (c) proving assistance to the United States Department of Labor and Pension Welfare Benefits Administration in connection with their own investigation of the Mass Termination

73.    Allstate filed the counterclaims, knowing full well they were devoid of legal and factual merit and otherwise intended to punish plaintiffs for filing charges and a lawsuit against it challenging, under ERISA and other theories, the validity of the Release, the interference with the attainment of the employee benefits and the wrongful termination of their employment contracts.  Allstate also filed the purported counterclaims with the intent to deter other similarly situated current and former employee agents from seeking to assert their rights under non-interference and anti-retaliation provisions of section 510 of ERISA, including participating in *Romero I* and *II*.  This intended "chilling effect" was felt acutely by employee agents who had sold their books of business either as part of the Mass Termination Program or at any time after June 30, 2000, and feared that Allstate would seek a so-called "constructive trust" on their businesses, homes, savings and other personal assets.

74.    The conduct of Allstate as set forth in this Count was intentional and deliberate and violates section 510 of ERISA, 29 U.S.C. § 1140.

75.    As a result of the unlawful and retaliatory conduct of Allstate as set forth in this Count, plaintiffs have been harmed and suffered both financial and non-financial losses, including, but not limited to, damage to their personal and professional reputations affecting their business and employment opportunities..

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs respectively pray as follows:

B.    That the actions of Allstate complained of herein be determined and adjudged to be in willful and knowing violation of the rights of plaintiffs under section 510 of ERISA, 29 U.S.C. § 1140, pursuant to 29 U.S.C. § 1132(a)(3);

C.    That the Court enter a judgment declaring that Allstate's actions are unlawful and in willful violation of the section 4(d) of the ADEA and section 510 of ERISA, pursuant to 29 U.S.C. §§ 626(c)(1) and 1132(a)(3) and 28 U.S.C. §§ 2201(a) and 2202;

D.    That the Court award plaintiffs all compensable damages, including all direct, incidental, consequential and liquidated and punitive damages, pursuant to 29 U.S.C. § 626(b) and federal common law, in amounts to be determined at trial;

E.    That the Court award plaintiffs punitive damages in amounts to be determined at trial;

F.    That the Court award plaintiffs their attorneys' fees, experts' fees, and the costs and expenses of this litigation;

G.    That the Court enter a broad form of injunction that prohibits Allstate from engaging in other acts of unlawful retaliation;

H.    That the Court retain jurisdiction until such time as it is satisfied that Allstate has remedied the unlawful practices complained of and it determines that Allstate is in full compliance with applicable law; and

I.    That the Court award plaintiffs such other and further legal and equitable

Respectfully submitted,

Paul D. Weller (PA Bar No. 61175)
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA  19103
Telephone: (215) 963-5000
Facsimile: (215) 963-5001

Michael Lieder (DC Bar No. 412029)
Latif Doman (DC Bar No. 466654)
SPRENGER & LANG, PLLC
1614 Twentieth Street, N.W.
Washington, D.C.  20009
Telephone: (202) 265-8010
Facsimile: (202) 332-6652

Paul Anton Zevnik (PA Bar No. 140986)
Michael J. Wilson (DC Bar No. 421274)
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone:  (202) 739-3000
Facsimile: (202) 739-3001

Susan Coler (MN Bar No. 217621)
SPRENGER & LANG, PLLC
325 Ridgewood Avenue
Minneapolis, Minnesota  55403
Telephone: (612) 871-8910
Facsimile: (612) 871-9270

Thomas W. Osborne (DC Bar No. 428164)
Mary Ellen Signorille (DC Bar No. 942474)
AARP FOUNDATION LITIGATION
601 E Street, N.W.
Washington, D.C.  20049
Telephone: (202) 434-2060
Facsimile: (202) 434-6424

*Attorneys for Plaintiffs*

## JURY DEMAND

**\*Plaintiffs demand trial by jury on all issues triable of right before a jury.**